NEUMANN-ENDLER, INC. *v.* UNITED STATES (MAJESTIC FORWARDING & SHIPPING CO., APPEARING AS PARTIES IN INTEREST) (No. 4282)[1]

[1] C. A. D. 105

United States Court of Customs and Patent Appeals, February 26, 1940

*Lamb & Lerch* (*John G. Lerch* and *Kenneth G. Osborn* of counsel) for appellant.
*John R. Rafter* for Parties in Interest.
*Joseph P. Tumulty, John Walsh,* and *Black, Varian & Simon, amici curiae.*
*Webster J. Oliver,* Assistant Attorney General, for the United States.

[Oral argument December 8, 1939, by Mr. Lerch and Mr. Rafter]

Before Garrett, Presiding Judge, and Bland, Hatfield, Lenroot, and Jackson, Associate Judges

Bland, Judge, delivered the opinion of the court:

In the summer of 1936 the Majestic Forwarding & Shipping Co. imported from Italy into this country, at the port of New York, certain felt hat bodies used for the making of women's hats. The Collector of Customs classified the merchandise under the provisions of paragraph 1115 (b) of the Tariff Act of 1930 and assessed the same with duty at 40 cents per pound and 55 per centum ad valorem under said paragraph as modified by proclamation of the President.

Neumann-Endler, Inc., an American manufacturer, under the authority of section 516 of said act, filed protest against the action of the collector and claimed that in addition to the duty which had been levied by the collector, the merchandise was dutiable under the latter part of said provision (as modified by proclamation of the President) at 12½ cents per article for the reason that said merchandise had been so processed in the country of exportation as to fall within the phrase "if pulled, stamped, blocked, or trimmed." No protest was filed against the action of the collector in assessing the merchandise with duty under said paragraph at 40 cents per pound and 55 per centum ad valorem.

Paragraph 1115 (b), as modified by the proclamation of the President, follows:

Par. 1115 (b). Bodies, hoods, forms, and shapes, for hats, bonnets, caps, berets, and similar articles, manufactured wholly or in part of wool felt, 40 cents per pound and 55 per centum ad valorem; and, in addition thereto, on all the foregoing, if *pulled, stamped, blocked, or trimmed* (including finished hats, bonnets, caps, berets, and similar articles) 12½ cents per article. [Italics ours]

The United States Customs Court, First Division, disposed of the protest by holding in effect that since the merchandise, according to this court's decision in *Cohn & Lewis* v. *United States*, 25 C. C. P. A. (Customs) 220, T. D. 49335, was not dutiable under the paragraph as "Bodies * * * for hats * * * manufactured wholly or in part of wool felt," the additional duty for pulling, stamping, blocking or trimming could not possibly apply, and overruled the protest.

The American producer appealed to this court and in *Neumann-Endler, Inc.* v. *United States* [etc.], 27 C. C. P. A. (Customs) 53, C. A. D. 61, this court held that as a matter of law, in the absence of protest, the classification as hat bodies and the assessment of duty of 40 cents per pound and 55 per centum ad valorem was conclusive and that the only issue before the trial court was that which was raised by the protest, to wit: Had the merchandise been pulled, stamped, blocked or trimmed within the meaning of the statute? The trial court not having passed upon that question, this court reversed its judgment

and remanded the cause with instructions to make certain findings. The language used follows:

\* \* \* The issue here is simply whether or not the hoods or hat bodies, the classification of which became final as being manufactured in whole or in part of wool felt, were pulled, stamped, blocked, or trimmed.

\*       \*       \*       \*       \*       \*       \*

The judgment appealed from must, therefore, be reversed for the reason that it is not based upon proper findings of fact and conclusions of law although the record made is sufficient for such findings.

Accordingly the judgment of the United States Customs Court is *reversed* and the cause is *remanded* for the purpose of making proper findings consistent with this opinion.

Pursuant to the mandate, the trial court rendered a decision, the pertinent portion of which follows:

Beyond this statement it is unnecessary for this Court to go, as under the remand of the appellate court we are limited to making findings in harmony with the views expressed by that court and, therefore, regardless of our individual views in the premises, we find, in accordance with the appellate court's direction, that the hat bodies in issue were not pulled, stamped, blocked, or trimmed, within the meaning of those terms as used in paragraph 1115(b), *supra*, and therefore conclude that the plaintiff has not sustained the claim made in the protest that the hats in issue were subject to the additional duty of 12½ cents per article.

The protest is therefore overruled. Judgment will issue accordingly.

As will be observed, the trial court made a definite finding that "the hat bodies in issue were not pulled, stamped, blocked, or trimmed, within the meaning of those terms as used in paragraph 1115(b)" and overruled the protest.

Neumann-Endler, Inc., the American producer, appellant herein, moved for a rehearing and urged that there was no finding of facts, such as it deemed necessary under the remand and such as would be sufficient to permit a proper assignment of errors on appeal. It submitted to the court proposed findings of fact and conclusions of law which we need not recite here. The motion was denied.

Appellant appealed here from the judgment of the trial court, and in this court assigned twenty errors, among which it challenged the correctness of the court's alleged failure to comply with the mandate of this court by not basing its judgment upon proper findings of fact and conclusions of law; that the court erred in ruling that the merchandise had not been so processed as to be dutiable under the said second provision of said paragraph 1115 (b); and that it erred in not granting the application for rehearing. The three assignments of error last above referred to, we think, are the only ones which require discussion here.

The first question to be decided is: Did the trial court fail to comply with the mandate of this court with reference to making proper findings of fact and conclusions of law?

It is urged by the appellee that there is a sufficient finding of facts inasmuch as the trial court definitely found that "the hat bodies in issue were not pulled, stamped, blocked, or trimmed, within the meaning of those terms as used in paragraph 1115 (b)." Neither party in this case contends that under the circumstances of this case a finding of facts by the trial court need not have been made.

From the above-quoted portion of the trial court's decision it might be concluded that in making its finding it was complying with what it regarded as a direction by this court to find that the bodies were not "pulled, stamped, blocked, or trimmed." However, we are sure that the trial court did not mean to so state. It is our understanding, in view of the history of the case to which we have previously alluded, that it was the "individual view" of the judges that it was not necessary for them to pass upon the issue, for the reason stated in its opinion in *Neumann-Endler, Inc.* v. *United States* [etc.], C. D. 43, 1 Cust. Ct. 163, that the merchandise was not dutiable under paragraph 1115 (b), *supra*, and that, therefore, no duty could be levied on the importation by reason of the last provision in the paragraph. Our reasons for remanding the case with the instructions hereinbefore referred to are sufficiently explained hereinbefore and in the opinion of this court in *Neumann-Endler, Inc.* v. *United States* [etc.], 27 C. C. P. A. (Customs) 53, C. A. D. 61.

In the instant case there are nearly 1,000 pages of testimony relating to the nature and effect of processing the articles. Seventeen witnesses testified for the American manufacturer and twenty witnesses testified for the party in interest (the importer). The testimony involves some conflict of views of witnesses as to what constitutes pulling and blocking (in effect it being conceded by appellant that the merchandise had not been stamped or trimmed prior to importation). There is considerable conflict in the evidence as to what processes the merchandise had been subjected to prior to importation. Likewise there is conflict as to the effect upon the merchandise of several different steps in the processes. Obviously, if the trial court had analyzed the evidence and made findings as to the weight to be given to it as bearing upon different questions which had to be decided before arriving at a decision on the ultimate facts found by the trial court, such analysis and finding would have had great weight in helping this court to reach its conclusion on the issue as to whether or not the goods should have been assessed with the additional duty of 12½ cents per article.

While the finding of facts made by the trial court, which may be regarded as a finding of the ultimate facts, necessarily involved a weighing of the evidence, it should be apparent to all that expressions of opinion by it upon the conflict of the testimony and the effect to be given to the different statements of the witnesses, (since it had the

opportunity of seeing and observing them as they testified) as is ordinarily done by trial courts whose decision rests largely on the weight of evidence, would have enabled the parties upon appeal to present the issues more definitely and clearly and made the task of this court much easier.

After giving the question careful thought, and in the light of the arguments presented, we are of the opinion that we should hold, and we do hold, under the facts of record, that there has been such a compliance on the part of the trial court with the mandate of this court as to justify us in deciding the issue presented upon the merits. And, even if it might be held that there has not been such a full compliance by the trial court with the mandate of this court as was to be expected, we find ourselves very much in the position that existed in *Draeger Shipping Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 454, T. D. 42644, and *Downing & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 293, T. D. 42873, to which cases we will make more definite reference.

The *Draeger Shipping Co.* case was a protest case where there was much testimony and where the trial court should have made a finding of fact. The trial court did not think it necessary to make a finding of fact relating to proof of commercial designation, feeling that it was bound by a determination of this question in another case. Its judgment was reversed and the cause remanded for the purpose of permitting the trial court to weigh the evidence and decide the case upon the facts of record. The trial court again failed to make any finding of fact. Upon appeal, Judge Barber, speaking for this court, said:

This leaves for consideration but one question: That is, have importers successfully maintained their contention that the trade and commerce of this country dealing in furs, including skins of both young and mature goats, definitely, uniformly, and generally regard a cross as a plate?

Much testimony was taken on this issue at the trial below, and it is fully analyzed in the briefs on both sides. To refer to the same in detail would extend this opinion to an unnecessary length. Upon this question we are entitled to have a finding of the trial court. It has declined to make that finding. The Government urges that the testimony on this issue is so discordant that it can not be held that in the trade and commerce dealing therewith a cross is a plate, and urges that the cause should be again remanded to the trial court for a finding on this question. Importers contend that the record so overwhelmingly shows that in the trade and commerce of this country a cross is generally, definitely, and uniformly known as a plate, that we should so find and reverse the judgment below without again remanding it for a specific finding on that issue.

In view of the history of this case and the record therein, we think the interests of justice will be promoted by a decision on the merits instead of awaiting the result of a remand for further finding.

The *Draeger Shipping Co.* case, *supra*, was relied upon for supporting authority in *Downing & Co. et al.* v. *United States*, *supra*, which was

an appeal in a reappraisement proceeding. In that case this court said:

Irrespective of what has been said, however, we are not disposed to again remand this cause for further findings of fact. One of these matters has been pending for approximately six and the other for approximately four years. In such case, there should be an end to the litigation. * * * .

The goods at bar were imported in 1936. While a remand to the trial court might result in this court having, in event of appeal, the judgment of the trial court as to the weight to be given to parts of the testimony of certain witnesses, we feel that to the end that justice should be done, the parties litigant should not suffer further delay but should have a decision upon the merits of the controversy.

By what we have said and held with reference to the sufficiency of the finding of facts under the particular circumstances of this case, we do not, of course, wish to be understood as holding that a finding of facts, similar to that in this case, is to be regarded as sufficient under all circumstances in protest cases involving testimonial records such as we have before us.

Although our decision of the principal issue, to wit, has the imported merchandise been pulled or blocked, involves a weighing of the testimony and some comment thereon in which we have not been helped to any great extent by the trial court's findings, we will proceed to decide that issue. Any attempt at a repetition here in detail of the testimony of the various witnesses would make for confusion rather than pellucidity. We will summarize the same as briefly as the circumstances will permit.

The great weight of the testimony is to the effect (and we think it is established clearly by the testimony as a whole) that the merchandise in controversy is made in the following manner (the first steps in manufacture not being in dispute will not be repeated): After the unfinished bodies are taken from the oscillating cone on which the first felting processes take place, they go through certain processes for the purpose of compacting the wool into the texture of felt. These processes bring about a pointed conical shape to the unfinished body which at that time has straight sides, no form of brim appearing. The weight of the testimony is to the effect that in this country and in the manufacturing plants of Italy the unfinished body then goes through a process known as "tip stretching." It seems that the tip stretching in this country and in Italy, although done on machines of somewhat different construction, accomplishes the same useful purpose of changing the conical sharp-pointed hood to a more rounded or oval shape which is the shape in which the merchandise was imported. Appellee's witnesses and some of appellant's witnesses agree upon the fact that the tip stretching step is a step toward finishing a hat body and is not a step toward making a hat from a hat body.

Appellant's Exhibit O is represented here by a photograph and is a tip stretching machine which was before the trial court when the testimony was taken. The testimony of appellee's witnesses is to the effect that there are several different kinds of tip stretching machines and that the machine or device upon which the imported bodies were tip stretched differed considerably from the one represented by Exhibit O. It appears from the testimony, however, that both types of machines perform the same character of operation. One of appellant's witnesses described the machine, Exhibit O, and its action in the following manner:

Q. Will you describe that action?—A. In the bottom part of the machine is a, we speak of it as a bottom stock, but I think it has been spoken of here as a cone with ribs on it. Above this is a top star, with fingers. These fingers are adjusted in such a position that they will be smaller than the bottom star. At this point the body, in order to soften the felt a bit, is either steamed, or put into hot water, and it is pulled over the star, so that the felt is tightened, and the top star coming down stretches the crown, which gives it a body as shown by Illustrative Exhibit I.

The bottom star is "rather a rounded metal piece, open in six places." The witness pointed out that the top star contains six so-called metal fingers and that they are set so that when they come down upon the bottom star they come approximately in the open spaces in the bottom star. It was made plain by the witnesses that this operation was performed prior to putting the body over a wooden block for the purpose of blocking or shaping the hat and that the machine was not a block and was not used for any blocking purpose.

One of importer's main witnesses, Giusseppe Fantacci, in testifying as to the tip stretching operation on the machines in Italy which are automatic, stated that the hat body is placed on the metal form and that two rings around the brim hold it tightly to the cone and that while it is so firmly held the cone is forced up into the crown and the crown pressed and stretched. It is shown by the testimony that on this character of machine one boy tip stretches 4,000 to 4,500 of these hat bodies in a single day of 8 hours and that two hoods are tip stretched at a time.

One of appellant's main witnesses, Kurt L. Neumann, definitely stated that tip stretching "is neither pulling nor blocking. It is an operation by itself" and he later specifically limited his testimony as to pulling and blocking to the "operation after the tip stretching." He furthermore said that "pulling" and "blocking" meant the same thing.

The weight of the testimony is to the effect that in producing the imported hat bodies, after the same have been tip stretched, they are "coned." The process of tip stretching leaves the articles in a wrinkled or creased condition. They are then pushed down over a

coning block which has the same form as the end of the oscillating cone upon which they were first formed, and the wrinkles are smoothed out and the sides are straightened. It seems to be the position of some of the witnesses for the American manufacturer that that operation as it is performed in this country is a blocking operation in finishing a hat, although it is to be noted that appellant's attorney has made no such contention here.

The testimony shows that in the blocking process in making a hat from a hat body, the body is pulled down on the block which aids in shaping and giving size to the hat. It also appears from the testimony that in pulling the body down on the block, the lower part of the body is so pulled and stretched as to cause it to flare and be given a brim characteristic.

We think the main issue presented in this case is determined by answering the question: Are the processes of tip stretching and coning steps in the process of making a finished hat body?

One of the American producer's witnesses, Joseph E. Helfer, who testified definitely that the imported merchandise had been pulled or blocked, further testified that he had bought "about thirty dozen hats at one time, from one of the body jobbers that was in the original form of a cone." He stated that they had not been tip stretched and that he undertook to block, pounce and buff them in this country; that when he had finished and taken the block off the die that the conical point in the body came back to some extent and the crown was distorted and the same distortion existed after it went through the pouncing and buffing machine and that he was required to throw the hats away. This witness seemed to believe from that experience that tip stretching was not only essential before blocking but that it was a part of the process of forming a hat rather than a hat body. To our minds it shows that the so-called cones which he had received and which had not been tip stretched were not finished hat bodies.

The witnesses on the part of the American producer testified for the most part as to what they did in this country with reference to finishing a hat from a hat body and expressed their views as to whether or not the imported merchandise, according to their standards in this country, had been blocked or pulled. There was great uniformity in the testimony of the witnesses on both sides (although there was some conflict) to the effect that "pulling" was a part of the process of blocking. The weight of the testimony discloses that a completed (tip stretched) straight-sided hat body which has been coned is put upon a block, after being steamed or soaked in water, and is pulled and pressed to a form to meet the style of hat requirements. Its size and shape are regulated by the pulling and blocking process. It may there be given a high crown, a creased crown, a crown low behind or low in front, a broad brim, a narrow brim, or no brim at all. The pulling and the

blocking is a process of making a hat of the desired size and shape from a hat body. The bodies as they come into this country, as far as the record discloses, are of uniform size.

It must be remembered that at the time the controverted provision, as well as the provision for hat bodies in general, was placed in the Tariff Act of 1930, there was no *eo nomine* provision for hat bodies. The American producers of hat bodies and the manufacturers of hats from imported hat bodies appeared before the committees of Congress when the act was being framed and demanded a separate classification of hat bodies which had become important articles of importation and also important articles of domestic production. After having represented that a separate classification and a certain amount of duty thereon was essential, it was suggested to the Committee on Ways and Means of the House (which had the bill under consideration) by Louis W. Stotesbury, representing the wool felt hat manufacturers of this country, that it was important to make a special provision in the new act for hat bodies which had been processed in a certain manner which was a process toward making a hat rather than making a hat body. Almost the exact language of the provision in controversy (at least its substance) was suggested by this witness.

The Committee on Ways and Means in reporting the bill to the House had the following to say concerning this provision:

\* \* \* It is proposed that a rate of duty of 25 cents be levied upon each article advanced beyond the hat-body condition. This 25 cents is, of course, additional to the rates of duty levied upon the hat body.

Before the Committee on Finance of the Senate (which took the controverted provision out of the bill) Mr. Stotesbury was called upon to tell what he meant by the pulling and blocking process and in answering the question as to what he had to say about the additional duty "for the pulled body" he answered:

Mr. STOTESBURY. That process is shown here [indicating photograph]. After a body is tip-stretched, as it is called, by this process, it is smoothed out. That is not a pulling process. The pulling process is that which converts the hat into a body shape, a head size; and the intention of the provision of the act, in the words "pulled, stamped, blocked, or trimmed"—it was an advance beyond the body type. This body is placed over a block, a head size block, and being pulled down, is shaped to that block, so that that body, if they are permitted to bring it in in that shape, accomplished by the process of pulling or blocking or stamping, can be sent directly to the retail milliner and sold as a hat.

The House provision as it appears in the Tariff Act was restored in conference.

From the foregoing, it is fair to assume that Congress had the same understanding as did most of the witnesses in the case at bar that pulling was a part of the blocking process and that blocking was a shaping of the hat to the desired size or shape after the body had

been completed. If Congress had desired that imported bodies, which had been completed by tip stretching and coning, should bear an additional duty it would have been an easy matter to have used appropriate language to have brought about that result, but it did not do so, and we are of the opinion that the processes through which the imported merchandise is shown to have gone were processes in making finished hat bodies and not processes directed toward making finished hats from hat bodies. The record shows in substance that hat bodies such as those at bar were the articles of commerce which were coming into this country at the time the instant act was framed. No one complained to Congress that tip stretching and coning were hat-forming operations and that a tip stretched, coned body should bear an additional duty, and we are of the opinion that Congress never intended that any of the processes to which the instant merchandise is by the record shown to have been subjected before importation should be regarded as encompassed by the term "pulled, stamped, blocked, or trimmed."

It is, therefore, our conclusion that the trial court properly found that the imported merchandise had not been "pulled, stamped, blocked, or trimmed" and properly overruled the protest of the American manufacturer. Our holding hereinbefore made renders unnecessary any discussion with reference to the assignment of error relating to the petition for rehearing. All of appellant's assignments of error have been carefully considered. No merit being found in any of them, the judgment of the United States Customs Court is *affirmed*.

LENROOT, Judge, concurs in the conclusion.